**Dale S. COENEN, Plaintiff-Appellant,**

v.

**R. W. PRESSPRICH & CO., Inc., Defendant-Appellee,**

and

**Stirling Homex Corporation, Defendant.**

**No. 153, Docket 71–1714.**

United States Court of Appeals, Second Circuit.

Submitted Oct. 20, 1971.

Decided Jan. 12, 1972.

Royall, Koegel & Wells, New York City (David F. Dobbins and Thomas W. Towell, Jr., New York City, on the brief), for plaintiff-appellant.

Winthrop, Stimson, Putnam & Roberts, New York City (Stephen A. Weiner and Arnold S. Anderson, New York City, on the brief), for defendant-appellee.

Before MEDINA, MANSFIELD and MULLIGAN, Circuit Judges.

MEDINA, Circuit Judge:

The question raised by this appeal is the applicability of the arbitration clause contained in the New York Stock Exchange Constitution to a claim which: (1) arose before the plaintiff joined the Stock Exchange; (2) alleges violation of the Securities Exchange Act of 1934; and (3) alleges violation of the Sherman and Clayton Acts. For the reasons that follow we hold that such a claim is subject to arbitration.

In 1968, while a director of Stirling Homex Corporation, Dale S. Coenen purchased 90,000 shares of Stirling Homex stock for investment purposes. The stock certificates bore the standard restriction against transfer unless the shares were registered, or unless Stirling was furnished with an opinion of counsel satisfactory to Stirling, to the effect that such registration was not required. In the Spring of 1970 Coenen, needing capital, desired to sell a substantial portion of the 90,000 shares. He contacted R. W. Pressprich & Co. and asked them to handle the sale of the shares. The sale took place on September 25, 1970.

In November, 1970, Coenen & Co., a brokerage house of which Coenen is an officer, applied for membership in the New York Stock Exchange. The application was approved and Coenen & Co. became a member of the Exchange on December 31, 1970. As an officer, Coenen automatically became an allied member.

On January 6, 1971 Coenen's counsel sent Pressprich a copy of a complaint that Coenen was going to file against Pressprich and Stirling, and asked if there was any chance of settlement. The complaint alleged that Pressprich and Stirling conspired to force Coenen into selling the Stirling stock at an unconscionably low price by refusing to allow the transfer of the shares free of the restrictive legend until the low price was

agreed upon. Coenen's complaint asserted three causes of action: one arising under the common law and the Uniform Commercial Code; another arising under the Securities Exchange Act of 1934; and the third arising under the Sherman and Clayton Acts.

On February 16, 1971, Pressprich demanded, in writing, that the controversy be submitted to arbitration in accordance with the Constitution of the New York Stock Exchange. Coenen replied by commencing the present action, in the United States District Court for the Southern District of New York, on February 18, 1971. Pressprich moved to stay the action, pending arbitration, on March 19, 1971. The motion was granted by Judge Metzner, ruling that by agreeing to abide by the Rules and Constitution of the Stock Exchange, Coenen agreed to submit "any controversy" with a member firm to arbitration, and that this controversy is a proper one for arbitration. Reported in 329 F.Supp. 1296 (S.D.N.Y.1971). For the reasons that follow, we agree with this conclusion.

## I

### Coenen Agreed to Arbitrate

### A

We turn our attention first to the question of whether Coenen agreed to arbitrate. This issue is governed by federal law by virtue of the Arbitration Act, Title 9 of the United States Code.

■■ Section 2 of the Act, 9 U.S.C. Section 2 (1970), makes enforceable all arbitration agreements concerning transactions relating to commerce. Section 3 of the Act, 9 U.S.C. Section 3 (1970), authorizes a Federal District Court to stay proceedings pending arbitration when there is an arbitration agreement that is validated by Section 2. The sale of securities here constitutes a transaction relating to commerce for the purposes of the Arbitration Act. Once a dispute is covered by the Act, federal law applies to all questions of interpretation, construction, validity, revocabili-

ty, and enforceability. Robert Lawrence Company v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir.1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960).

Article VIII, Section 1 of the New York Stock Exchange Constitution provides:

> Any controversy between parties who are members, allied members, member firms or member corporations shall, at the instance of any such party, and any controversy between a non-member and a member or allied member or member firm or member corporation arising out of the business of such member, allied member, member firm or member corporation, * * * shall, at the instance of such non-member, be submitted for arbitration, in accordance with the provisions of the Constitution and the rules of the Board of Governors.

An examination of the applicable federal law on the subject convinces us that Coenen is bound by these terms.

> The constitution and rules of a stock exchange constitute a contract between all members of the exchange with each other and with the exchange itself * * *.
>
> Since the rules of the Exchange "constitute a contract between the members, the arbitration provisions which they embody have contractual validity." * * * The Exchange provisions requiring arbitration constitute an agreement to arbitrate which is binding upon both [parties].

Brown v. Gilligan, Will & Co., 287 F. Supp. 766, 769–770 (S.D.N.Y.1968). See also Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2d Cir. 1971).

Coenen, moreover, signed a pledge, in his application for membership, that he would "abide by the Constitution [of the Exchange] as the same has been or shall be from time to time amended, and by all rules adopted pursuant to the Consti-

tution * * *." Accordingly, we have no doubt that Coenen agreed to arbitrate.

In thus agreeing to arbitrate "[a]ny controversy between * * * members * * *," did Coenen agree to arbitrate the present dispute with Pressprich?

■ "The issue of arbitrability, i.e., whether a particular dispute is covered by an arbitration clause, being a question of 'interpretation and construction,'" is governed by federal law. Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 385 (2d Cir.1961). In deciding the question of arbitrability, the "federal policy [is] to construe liberally arbitration clauses, to find that they cover disputes reasonably contemplated by this language, and to resolve doubts in favor of arbitration * * *." Metro Industrial Painting Corp. v. Terminal Construction Co., supra, 287 F.2d 382, 385 (2d Cir.1961). With this liberal federal policy in mind, we turn to an examination of the clause at issue in this case.

■ The drafters of the New York Stock Exchange arbitration clause intended it to be very broad. This is evident when it is compared to the Stock Exchange provision governing the arbitration of disputes between a member and a non-member, which must arise out of the business of the member. The purpose behind the drafting of such a broad arbitration clause was, as much as possible, to keep disputes between members out of the courts. This policy is entirely consistent with the congressional grant of power to Stock Exchanges to govern themselves, contained in the Securities Exchange Act of 1934. See Axelrod & Co. v. Kordich, Victor & Neufeld, supra, 451 F.2d at 840 (2d Cir. 1971); Brown v. Gilligan, Will & Co., supra, 287 F.Supp. 766, 773 (S.D. N.Y.1968). To hold that the present dispute is not arbitrable would frustrate this policy by making two Stock Exchange members settle their dispute in court. In fact, we see no substantial difference between this case and the countless others where parties have agreed to arbitrate an existing controversy. Coenen agreed to arbitrate "[a]ny controversy between * * * members * * *," with full knowledge that he had a claim against Pressprich and that Pressprich was a Stock Exchange member.

One desiring the benefits of membership in the New York Stock Exchange must be willing to live up to the responsibilities of such membership.

### B

■ Coenen's argument that the New York Stock Exchange arbitration clause only applies to "future" disputes that arise after both parties have become members of the Exchange need not detain us long. As an implementation of the statutory policy of self-regulation, we think the clause is clear on its face. It reads "any controversy" between members. And that is precisely what it must mean if controversies between members are to be kept out of the courts. Had those who drafted the clause intended otherwise they doubtless would have used language plainly stating that "any future controversy" or any controversy between members "arising after both parties to the dispute have become" members. Moreover, the two clauses referring to disputes between members and disputes between members and non-members must be read together. In the one clause the reference is to "any controversy," and in the other the reference is to any controversy "arising out of the business of such member." The purpose of each clause is to keep "any controversy" between members and any controversy "between members and non-members * * * arising out of the business of such member" out of the courts. This purpose would be frustrated and in effect nullified if we were to construe such clause as applicable only to "future" disputes.

### II

### *The Section 10(b) Claim*

■ Coenen also contends that because one of his claims for relief is

based upon an alleged violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78j(b) (1970), the claim is not arbitrable. To support this assertion, he relies upon Section 29(a) of the 1934 Act, 15 U.S.C. Section 78cc(a) (1970), which voids any provision for waiver of statutory rights.

The Supreme Court, in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), held that Section 14 of the 1933 Act, 15 U.S.C. Section 77n (1970) (which is virtually identical to Section 29(a) of the 1934 Act) made an agreement to arbitrate a claim arising under the 1933 Act unenforceable. The rationale of the decision was that the agreement was made before the existence of any controversy, thus restricting plaintiff in his choice of forum before there was any dispute. "While the Securities Act does not require a petitioner to sue, a waiver in advance of a controversy stands upon a different footing." 346 U.S. at 438, 74 S.Ct. at 188. The present case, however, differs from *Wilko* in two important respects.

First of all, Coenen agreed to arbitrate *after* the dispute had arisen. This question was left open by the Court in *Wilko*, 346 U.S. at 438, 74 S.Ct. 182 (concurring opinion of Jackson, J.). In subsequent decisions, however, courts have held that agreements to arbitrate made after a dispute has arisen are valid. Gardner v. Shearson, Hammill & Co., 433 F.2d 367 (5th Cir.1970); Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242 (3d Cir.1968).

Secondly, *Wilko* involved a dispute between an investor and a member of a national securities exchange, not a dispute "between members." It has been held that:

The 1933 Act was designed to protect investors by requiring "issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale." Wilko v. Swan, * * * 346 U.S. at 431, [74 S.Ct.

182 * * *. Its determined purpose was not to furnish protection to dealers from the improprieties of fellow dealers, although such might be an incidental benefit of the Act's passage. It was assumed that dealers could fend for themselves; it was the investing public that was in need of protection.

Brown v. Gilligan, Will & Co., *supra*, 287 F.Supp. 766, 771–772 (S.D.N.Y.1968). This interpretation of *Wilko* was recently endorsed by this Court in Axelrod & Co. v. Kordich, Victor & Neufeld, *supra*, 451 F.2d 842, 843 (2d Cir. 1971), where Judge Timbers, writing for a unanimous panel, observed:

[T]he policy considerations relied on by the Supreme Court in *Wilko* are inapposite here. The Supreme Court found that the non-waiver provision there involved was designed to protect investors. 346 U.S. at 431, 74 S.Ct. 182. Without such provision, financial houses might escape statutory liability by taking advantage of the inferior bargaining position of customers. But the legislative policy of protecting investors will not be thwarted by compelling an exchange member to arbitrate * * *.

The 1934 Act, moreover, contains a provision that the 1933 Act does not (and it was only the 1933 Act which was at issue in *Wilko*). Section 28(b) of the 1934 Act, 15 U.S.C. Section 78bb(b) (1970), provides:

Nothing in this chapter shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action taken by the authorities of such exchange to settle disputes between its members * * *.

The Court in *Axelrod, supra,* reconciled Sections 29(a) and 28(b) of the 1934 Act by saying that Section 28(b) creates an exception to Section 29(a) and permits the arbitration of a dispute, involving the 1934 Act, pursuant to the New York Stock Exchange arbitration clause. See also *Brown, supra,* 287 F.Supp. 766,

774. Judge Timbers went on to say, in *Axelrod,* that this interpretation of the 1934 Act is entirely consistent with the Congressional purpose of giving securities exchanges the power of self-regulation.

The 1934 Act established a statutory scheme of "supervised self-regulation" for stock exchanges. "This involves control of exchange markets by requiring or permitting national securities exchanges to adopt rules governing their practices and procedures and the business conduct of the members, and in each case imposes the responsibility for enforcement of these rules on the exchanges themselves." SEC, Report of Special Study of Securities Markets, H.R.Doc. No. 95, 88th Cong., 1st Sess., pt. 1, at 3 (1963). See Colonial Realty Corporation v. Bache & Co., 358 F.2d 178, 181 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 352 (1963).

*Axelrod, supra,* 451 F.2d at 838, 840 (2d Cir. 1971). See also *Brown, supra,* 287 F.Supp. 766, 773 (S.D.N.Y.1968).

Pursuant to this self-regulatory scheme, the exchanges have promulgated rules to govern the conduct of members. The 1934 Act requires that such rules be "just and adequate to insure fair dealing and to protect investors * * *." Section 6(d), 15 U.S.C. Section 78f(d) (1970). Furthermore, Section 6(c), 15 U.S.C. Section 78f(c) (1970) provides:

Nothing in this chapter shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this chapter and the rules and regulations thereunder * * *.

See also *Axelrod, supra,* 451 F.2d 840 (2d Cir. 1971); *Brown, supra,* 287 F.Supp. 766, 773–774 (S.D.N.Y.1968).

We fully agree with the reasoning in *Brown* and *Axelrod* that the arbitration clause contained in the New York Stock Exchange Constitution is precisely the kind of self-regulatory provision called for by the 1934 Act. Instead of violating the policy behind the Act, as appellant contends, arbitration in this case furthers that policy.

## III

### *The Antitrust Claims*

■ Coenen's final contention is that his Third Count is not arbitrable because it alleges violation of Sections 1 and 2 of the Sherman Act and Sections 4 and 12 of the Clayton Act.

At this point we must examine the allegations of the complaint more closely. Pressprich as an investment banker and stockbroker is alleged to make "a market in the over-the-counter trading of the common stock of Stirling Homex Corporation." At a time when he was a director of Stirling and in August 1968 Coenen bought 90,000 shares of Stirling and the certificates of stock issued to him bore the legend that they were "acquired for investment" and would not be transferred unless registered under the 1933 Act or Stirling was furnished with an opinion of counsel satisfactory to Stirling to the effect that no registration was required. In February, 1970 underwriters represented by Pressprich sold 1,175,000 shares to the public "pursuant to a registration statement" under the 1933 Act. In the Spring of 1970, it is alleged, Coenen and his firm were being pressed by banks for additional collateral on its loans and they decided "to sell a substantial portion of [Coenen's] 90,000 shares in Stirling." Pressprich and Stirling, however, were alleged to have agreed to "maintain or increase" the price of Stirling stock on the market by "limiting or reducing" the supply of Stirling stock on the open market and hence decided to keep Coenen's 90,000 shares off the market by representing to Coenen that his 90,000 shares could not legally be sold without having been registered. The allegations concern attempts to obtain letters from various counsel and Stirling's position that "such opinions were unsatisfactory."

Without an order from Stirling the First National City Bank in New York, the transfer agent, would not transfer the stock containing the legend. This led to what appears to be the central feature of the dispute, an alleged sale of the 90,000 shares by Coenen through Pressprich to an institutional buyer at $10 a share. A "purported" confirmation of this sale was sent by Pressprich to Coenen on August 26, 1970 but Coenen "disavowed the purported sale" before the delivery date of September 2, 1970. The complaint alleges various misrepresentations by Pressprich which resulted in the "coercion" which caused Coenen to give in and on September 25, 1970 to direct "that his shares be delivered to Pressprich at a price of $10 per share." All this is alleged in Count One, a diversity claim, repeated in the Fourth Count as a breach of duty under the common law and Section 8–401 of the Uniform Commercial Code. The same allegations are repeated in Count Two as constituting a scheme to defraud Coenen within the meaning of Rule 10b–5 promulgated in implementation of Section 10(b) of the 1934 Act. And the same allegations are repeated in Count Three, coupled with the purely conclusory statement that this is a claim based upon Sections 4 and 12 of the Clayton Act, 15 U.S.C. Sections 15 and 22, and that the acts alleged constitute a combination and conspiracy in restraint of trade in the common stock of Stirling, in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1, and an unlawful conspiracy to monopolize the market in the trading of the stock of Stirling, in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2. In this Count Three Coenen demands triple damages in the total amount of $4,725,000 and attorneys' fees.

There have been many statements in court opinions to the general effect that antitrust claims are not proper subjects for arbitration. See e. g., American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2d Cir.

1968); Matter of Aimcee Wholesale Corp., 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968); Power Replacements, Inc. v. Air Preheater Co., 426 F. 2d 980 (9th Cir. 1970); A. & E. Plastik Pak Co. v. Monsanto Co., 396 F.2d 710 (9th Cir. 1968).

The court below, however, ruled that arbitration is proper in this case because the agreement to arbitrate was made after the dispute arose. This is consistent with the language in several cases recognizing this exception to the general rule. See e. g., American Safety Equipment Corp. v. J. P. Maguire & Co., supra, 391 F.2d 821, 827 (2d Cir. 1968); Power Replacements, Inc. v. Air Preheater Co., supra, 426 F.2d 980, 984 (9th Cir. 1970); Pitofsky, Arbitration and Antitrust Enforcement, 44 N.Y.U.L.Rev. 1072, 1079–80, n. 31 (1969). We base our affirmance squarely on this ground. The courts give as reasons for this that the parties already know just what they are agreeing to arbitrate, and also that, as a claimant is not required to sue and is always free to settle a private triple-damage antitrust case, his agreement to arbitrate is in effect an agreement to settle the dispute. So here the agreement to arbitrate may be regarded as an agreement to arbitrate a specific existing dispute.

We think it proper to add, however, that, except for what appear to be no more than perfunctory and formal allegations of an antitrust claim, this complaint asserts what looks like the common, garden variety of alleged scheme to defraud in a security transaction. This is precisely the sort of breeder of ill-feeling between members of the Exchange it was intended to keep out of the courts. It will be a pity if it should ever be held that any member of the Stock Exchange can frustrate the arbitration clause of the Stock Exchange Constitution, the most significant of the measures taken to implement the self-regulation contemplated by the 1934 Act, by merely tossing into a complaint involving a dispute that arose after both

parties to the dispute had become members of the Exchange, a few conclusory phrases to give the illusion of a triple-damage antitrust claim.

Accordingly, the arbitration may proceed. And, after it is concluded, hopefully in a few days, these stockbrokers can get back to work.

Affirmed.