**John D. LAUPHEIMER, Appellant,**

v.

**McDONNELL & CO., INC., et al.,
Appellees.**

**No. 908, Docket 73-2721.**

United States Court of Appeals,
Second Circuit.

Argued May 15, 1974.

Decided July 5, 1974.

**22**

Philip C. Patterson, Philadelphia, Pa. (Blank, Rome, Klaus & Comisky, Philadelphia, Pa.; Jay H. Landau, Zimmer, Fishbach, Hertan & Haberman, New York City), for appellant.

Michael J. McAllister, New York City (Lunney & Crocco, New York City; J. Robert Lunney, New York City, of counsel), for appellee T. Murray McDonnell.*

Before KAUFMAN, Chief Judge, HAYS and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from an order of the District Court for the Southern District of New York, Robert L. Carter, *Judge*, granting a motion to stay all proceedings pending arbitration in this "Go-Go Years" securities fraud case. This appeal raises a question left in the interstices between Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), and Coenen v. R. W. Pressprich & Co., 453 F.2d 1209 (2d Cir.), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); in short, whether one who claims that he was fraudulently enticed to join the employ of and become an officer and stockholder in a brokerage firm, and thereby to become a member of the American Stock Exchange ("AmEx") and New York Stock Exchange ("NYSE"), is required to submit the controversy to arbitration, rather than to seek his relief in federal courts, because the AmEx's constitution provides that holders of stock and officers of member corporations and members of the Exchange must submit to arbitration "all controversies arising in connection with their business between or among themselves."[1]

Appellee McDonnell & Co., Inc. ("the firm"), which has not filed any brief in opposition to the appellant here,[2] was a

---

* Lord, Day & Lord, New York, N. Y. (John J. Loflin and Richard Gaines, of counsel), filed a brief for the American Stock Exchange, Inc., as amicus curiae seeking affirmance.

1. Article VIII, Section 1, of the AmEx's constitution provided during the time the transactions here were consummated:

   Members, member firms, partners of member firms, member corporations and officers and holders of stock in member corporations shall arbitrate all controversies arising in connection with their business between or among themselves or between them and their customers as required by any customer's agreement or, in the absence of a written agreement, if the customer chooses to arbitrate.

   As of July 1, 1970 (after the cause of action arose but before the filing of the complaint in this action), Article VIII, Section 1, was amended so as to delete the words "and holders of stock . . . ." In view of

our disposition of the case, we need not determine whether the old or amended provision applies here.

The NYSE has a similar provision which requires arbitration of "[a]ny controversy between parties who are members, allied members, member firms or member corporations . . . ." *See generally* Coenen v. R. W. Pressprich & Co., 453 F.2d 1209 (2d Cir.), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972). The motion for the stay in the district court, however, was sought and granted only upon the arbitration provision in the AmEx's constitution.

2. On April 5, 1971, on the complaint of the trustee for the Special Trust Fund of the NYSE, the Chancery Court of New Castle County, Delaware, entered an order granting appointment of a receiver of and for McDonnell & Co. No brief was filed pursuant to another order in the receivership proceedings.

registered broker/dealer in securities under § 15(b) of the Securities Exchange Act of 1934 ("the 1934 act"), 15 U.S.C. § 78o(b), until April 9, 1970, when its registration was revoked pursuant to a consent order by the SEC for various willful violations of the securities laws and the NYSE requirements. The firm had been a member of the NYSE and AmEx until August 13, 1970, when it resigned its memberships. Appellee T. Murray McDonnell as principal officer and stockholder of the firm was an allied member of the Exchanges until the August date. Appellee Morgan McDonnell and the late Thomas McKay, whose estate is an appellee here, were also principal officers of the firm; the other appellee is the firm's receiver.

Appellant Laupheimer's complaint alleges that during the last quarter of 1968 and the first two months of 1969 appellees made separate offers to sell firm stock to approximately eight McDonnell employees and prospective employees, one of the latter of whom was Laupheimer. Ostensibly the offer of employment and firm stock was for the purpose of establishing a corporate underwriting department; in reality, it is alleged, the firm was already in violation of NYSE Rule 325, which in the period here involved provided that the ra-

tio of debts to capital could in no event exceed 20 to 1, and the firm was desperately attempting to raise capital to bring itself into compliance. Through oral representations beginning in November, 1968, and later through written representations in 1969, Laupheimer was led to believe that the firm was making a good profit and in good financial condition, and that its back office operations (*i.e.,* recordkeeping, stock certificate transfers, etc.) were sound, none of which was true.[3] It was on the basis of these representations that Laupheimer left his employment with Laird Properties, Inc., a real estate affiliate of an investment banking firm in Wilmington, Delaware, and accepted employment with McDonnell on January 6, 1969. Later he was given a written offer to purchase the firm's stock which he accepted, actually receiving the stock on or about March 20, 1969.

This action was instituted on January 8, 1973, and on June 15, 1973, appellee T. Murray McDonnell moved by an order to show cause for a stay of the action pending arbitration. This was granted by Judge Carter on September 17, 1973, in a memorandum endorsement which is the order under appeal. In the proceedings on the motion for a stay pending arbitration the AmEx appeared as ami-

---

3. Appellant's complaint was in eight counts.

Count I—Violations of Section 10(b) of the 1934 act, 15 U.S.C. § 78j(b); Securities and Exchange Commission Rules 10b, 17 C.F.R. § 240.10b–5, 17a–3, 17 C.F.R. § 240.17a–3; and Rule 325 of the NYSE.

Count II—Violations of Section 17(a) of the Securities Act of 1933 ("the 1933 act"), 15 U.S.C. § 77q(a); and Rule 325 of the NYSE.

Count III—Violations of Section 15(c)(1) of the 1934 act, 15 U.S.C. § 78o(c)(1); and SEC Rules 15c1–2, –3, 17 C.F.R. § 240.-15c1–2, –3; and Rule 325 of the NYSE.

Count IV—Violations of Section 12(2) of the 1933 act, 15 U.S.C. § 77l(2).

Count V—Violations of Sections 5(a), (c) and 12(1) of the 1933 act, 15 U.S.C. §§ 77e(a), (c) and 77l(1).

Count VI—Common law fraud.

Count VII—Common law negligence.

Count VIII—Violations of New York General Business Law § 352–c McKinney's Consol.Laws, c. 20.

Counts IV, V and VII were dismissed on June 8, 1973, as time-barred.

In particular, appellant alleges fraud in McDonnell's failure to disclose its noncompliance with the minimum capital requirements of NYSE Rule 325; in McDonnell's brochure which falsely stated that its capital ratio was 1.435 per cent and that its after-tax profit had been maintained at 4.4 per cent of income; in McDonnell's profit and loss statement provided appellant which showed net profits of $950,862 for the eight months ended August 30, 1968, when McDonnell in fact lost $1.8 million in the last four months of the year; and in the firm's failing to disclose that its back office operations were in a state of total disarray so that it was not keeping current and accurate books and records in the manner required by SEC Rule 17a–3, 17 C.F.R. § 240.17a–3.

cus curiae supporting T. Murray McDonnell's motion and indeed filed a brief in connection with this appeal, although it did not appear in oral argument.

The district court determined that appellant became an officer of the firm on January 6, 1969,[4] and applied for membership in the AmEx on February 28, 1969. The district court also found that "[t]he activity which plaintiff relies upon as an inducement took place in late January and February, 1969 and the transaction was consummated in March." From this the court below concluded that during all that time all parties were either member corporations, officers or allied members of the AmEx and as such were bound by the language of Article VIII, Section 1 of the AmEx's constitution—in other words, appellees could require that appellant's claims first be tested in arbitration.

Initially it must be pointed out that the district court's statement that "[t]he activity which plaintiff relies upon as an inducement took place in late January and February . . .," so that [d]uring all that time" he was at least an officer of McDonnell, is not supported by the record. While it may be true that all *written* inducements to purchase stock were given appellant after he became an officer, his complaint and supporting affidavits assert that he was given false oral representations in November and December of 1968, before he joined McDonnell, which induced him to leave his old job and to join McDonnell. Perhaps the district court viewed these representations only as in-

ducements to securing appellant's employment, but that is not what appellant alleges. In November, 1968, appellant was contacted by Joseph Rice, who himself was newly employed by McDonnell, and who requested appellant to meet with certain officers of McDonnell "to discuss the possibility of [his] becoming an officer and stockholder of McDonnell." Later in November appellant met with appellee T. Murray McDonnell and Thomas L. Cassidy, officers of the firm, who "sought to persuade [appellant] to become a Vice-President of McDonnell, a member of its underwriting group, and a stockholder of McDonnell." Appellant further alleges that on various occasions in November and December, 1968, Murray McDonnell and Cassidy represented that McDonnell was making a good profit, was in good financial condition, and that its back office operations were normal. Relying on these representations appellant quit his job, joined McDonnell and agreed to buy 1,000 shares of McDonnell stock. In appellant's words, "As far as I was concerned my acceptance of a position as an officer of McDonnell stock [sic] and my purchase of McDonnell stock, were indispensable to each other." Corroboration that this was the understanding of appellees as well is found in the directors' "consent" of January 20, 1969, which purported to consent at the same time to appellant's election as an officer and to the authorization and issuance of 1,000 shares of stock to appellant.

We, therefore, find that appellees were offering appellant a package—em-

---

4. January 6, 1969, was, of course, the day that appellant began his employment with McDonnell. On January 20, 1969, seven of McDonnell's nine directors signed a form purportedly constituting a "consent" of the board of directors to the appointment of Laupheimer (as well as others), as a vice president of McDonnell. According to Delaware Corporation Law § 141(f), unless otherwise prohibited by the certificate or bylaws, any action requiring a meeting of the board of directors may be carried out without a meeting if *all* the directors consent. Appellant now claims that because all direc-

tors did not sign the consent, he never actually was appointed an officer, and thereby would not be required to submit to arbitration. Appellant, however, ignores another section of the Corporation Law, § 142(b), which allows officers to be appointed however the bylaws or directors indicate. In other words, there is no statutory requirement that officers be appointed at a meeting of the directors. The district court's finding of fact, therefore, that appellant became an officer on January 6, 1969, is supported in the record.

ployment as an officer with resulting allied membership in the AmEx *and* the opportunity to purchase 1,000 shares of McDonnell stock. The representations, allegedly false, were made prior to appellant's joining the firm in order to induce him to accept this package. Representations continued after he actually joined the firm to insure that he would not back out or blow the whistle.

The question thus becomes whether the fact that when the stock purchase aspect of the package was fulfilled appellant already had become an officer, requires the enforcement of the AmEx constitutional provision which provides for arbitration. Our research has found no case directly on point. One case, however, is very closely analogous to the present one. In that case, Danford v. Schwabacher, 342 F.Supp. 65 (N.D.Cal. 1972), appeal dismissed, 488 F.2d 454 (9th Cir. 1973), a customer and employee of a brokerage house was induced by false representations to invest $15,000 in the firm to become a general partner and thereby a member of the exchange. When he brought suit in federal court for fraud in violation of the securities acts, the firm moved to stay the proceedings pending arbitration pursuant to the NYSE provision requiring arbitration of disputes between members. The court denied the motion, finding that the fraud was directed against the plaintiff as a customer rather than as an exchange member. The court concluded with what appears to us the utmost sagacity:

> A security dealer may not defraud a customer, in the course of the fraud convert him into an exchange member, and thereby deprive him of the protection of the securities laws and of the courts.

*Id.* 342 F.Supp. at 69. This statement, moreover, seems to apply to the case at hand, for viewing the employment contract and the sale of stock as a package offer by appellees, it then is but a technicality—a distinction without a difference—that one part of it was fulfilled before another, rather than simultaneously, as was apparently the case in *Danford*. Substantial rights are not to be lost through such artificialities, especially where the effective dates of these transactions were largely under the control of those who might wish to avoid federal court determination of liability by maneuver. As the court reasoned in *Danford*, the alleged fraud here was perpetrated against appellant Laupheimer not as an officer of the firm, a member of the AmEx or a stockholder, but as an outsider who had capital desired by the firm. As such he is entitled to the protection of the federal securities laws in federal courts, and not to be required to go to arbitration by the self-same fraud of which he complains.

Coenen v. R. W. Pressprich & Co., *supra,* is not to the contrary. In *Coenen* the plaintiff voluntarily and for reasons not causally connected to his securities claim became a member of the NYSE "with full knowledge that he had a claim against Pressprich and that Pressprich was a Stock Exchange member." *Id.* 453 F.2d at 1212. In other words, by joining the NYSE with its requirement that members arbitrate disputes, with his knowledge of an existing dispute with another member, the plaintiff in *Coenen* waived his right to have his claim determined by a federal court rather than an arbitrator. *See also* Gardner v. Shearson, Hammill & Co., 433 F.2d 367 (5th Cir. 1970), cert. denied, 401 U.S. 978, 91 S.Ct. 1209, 28 L. Ed. 329 (1971); Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242 (3d Cir. 1968). That is certainly not the situation here. Appellant Laupheimer at the time he became an officer, a member of the exchanges, or a stockholder had no idea that he had been defrauded. Here there was no existing dispute, the resolution of which by a court he might have waived, when he accepted employment with McDonnell, became an allied member of the exchanges, or even accepted receipt of his stock.

In finding the present dispute not arbitrable under 9 U.S.C. § 3 we are not unmindful that "the federal policy [is]

to construe liberally arbitration clauses, to find that they cover disputes reasonably contemplated by this language, and to resolve doubts in favor of arbitration. . . ." Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 385 (2d Cir.), cert. denied, 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961). This language, however, must be tempered by the policy of Wilko v. Swan, *supra*. In *Wilko* an agreement to arbitrate any margin dispute, prior to the existence of any controversy, was held prohibited by the 1933 act. As interpreted by later courts the decision in *Wilko* has stood for the proposition that agreements to arbitrate any dispute surrounding the sale of securities, made before any dispute arises, will not be enforced against a member of the investing public. *See, e.g.*, Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838, 842–843 (2d Cir. 1971). As was recognized in *Axelrod*, to enforce arbitration agreements like that in *Wilko* would make it easy for unscrupulous dealers to avoid statutory liability under the securities acts by using their superior bargaining position to require arbitration clauses in contracts with members of the investing public. The same might be said of the circumstances here. Here the package deal insured that the purchaser of the stock would also be subject to the exchanges' arbitration provisions, so the practical effect of the package deal was to require a member of the investing public—appellant Laupheimer before he became an officer of McDonnell—to agree to a broad arbitration provision before he could purchase the shares of McDonnell. Were we to

enforce the AmEx's arbitration provision under these circumstances it would provide an incentive for unscrupulous dealers wishing to raise capital merely to appoint as officers those persons it could entice into buying stock, thereby avoiding statutory liability.[5] In short, inasmuch as appellant was a member of the investing public when the fraud began, and inasmuch as his status changed to that of an officer only as a result of that fraud, he is entitled to those statutory protections afforded members of the investing public, including the choice of forum.[6]

Judgment reversed and cause remanded.

---

5. Appellant Laupheimer was not the only person induced by the scheme to raise capital by appointing someone an officer and having him buy stock. At least one other person has already had his day in court and won on claims nearly identical to those here. *See* Green v. McDonnell & Co., No. 71 C 1387 (N.D.Ill. Aug. 23, 1972). In that case appellees did not attempt to seek arbitration of the claims, which they might have on the same grounds alleged here; having lost there, they may well fear application of col-

lateral estoppel against them here unless they can have the claims referred to arbitration.

6. Lest there be any doubt, while this decision depends on the fact that the fraud began before appellant was an officer or member of the exchange, proof of the fraud finally consummated is not restricted to the representations made before appellant was an officer or member.