508 F.2d 969
 PARSONS & WHITTEMORE OVERSEAS CO., INC., Plaintiff-Appellant-Appellee,
v.
SOCIETE GENERALE DE L'INDUSTRIE DU PAPIER (RAKTA), and Bank
of America, Defendants-Appellees, Societe Generale
de L'Industrie du Papier (RAKTA),
Defendant-Appellee-appellant.
 Nos. 174 and 637, Docket 74-1642 and 74-1676.
 United States Court of Appeals, Second Circuit.
 Argued Nov. 20, 1974.
Decided Dec. 23, 1974.
 
 Malcolm A. Hoffmann, New York City (Edward A. Woolley and Frank J. Kaufman, New York City, of counsel), for plaintiff-appellant-appellee.
 Jerome Doyle (Cahill, Gordon & Reindel, New York City, Martin L. Lieberman and Edward F. Hummer, Jr., New York City, of counsel), for defendant-appellee-appellant.
 Before SMITH, HAYS and MANSFIELD, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 Parsons & Whittemore Overseas Co., Inc., (Overseas), an American corporation, appeals from the entry of summary judgment on February 25, 1974, by Judge Lloyd F. MacMahon of the Southern District of New York on the counter-claim by Societe Generale de L'Industrie du Papier (RAKTA), an Egyptian corporation, to confirm a foreign arbitral award holding Overseas liable to RAKTA for breach of contract. RAKTA in turn challenges the court's concurrent order granting summary judgment on Overseas' complaint, which sought a declaratory judgment denying RAKTA's entitlement to recover the amount of a letter of credit issued by Bank of America[1] in RAKTA's favor at Overseas' request. Jurisdiction is based on 9 U.S.C. 203, which empowers federal district courts to hear cases to recognize and enforce foreign arbitral awards, and 9 U.S.C. 205, which authorizes the removal of such cases from state courts, as was accomplished in this instance.[2] We affirm the district court's confirmation of the foreign award. Since it has been established that RAKTA can fully satisfy the award out of a supersedeas bond posted by Overseas, we need not and do not rule on RAKTA's appeal from the adjudication of its letter of credit claim.
 
 
 2
 In November 1962, Overseas consented by written agreement with RAKTA to construct, start up and, for one year, manage and supervise a paperboard mill in Alexandria, Egypt. The Agency for International Development (AID), a branch of the United States State Department, would finance the project by supplying RAKTA with funds with which to purchase letters of credit in Overseas' favor. Among the contract's terms was an arbitration clause, which provided a means to settle differences arising in the course of performance, and a 'force majeure' clause, which excused delay in performance due to causes beyond Overseas' reasonable capacity to control.
 
 
 3
 Work proceeded as planned until May, 1967. Then, with the Arab-Israeli Six Day War on the horizon, recurrent expressions of Egyptian hostility to Americans-- nationals of the principal ally of the Israeli enemy-- caused the majority of the Overseas work crew to leave Egypt. On June 6, the Egyptian government broke diplomatic ties with the United States and ordered all Americans expelled from Egypt except those who would apply and qualify for a special visa.
 
 
 4
 Having abandoned the project for the present with the construction phase near completion, Overseas notified RAKTA that it regarded this postponement as excused by the force majeure clause. RAKTA disagreed and sought damages for breach of contract. Overseas refused to settle and RAKTA, already at work on completing the performance promised by Overseas, invoked the arbitration clause. Overseas responded by calling into play the clause's option to bring a dispute directly to a three-man arbitral board governed by the rules of the International Chamber of Commerce. After several sessions in 1970, the tribunal issued a preliminary award, which recognized Overseas' force majeure defense as good only during the period from May 28 to June 30, 1967. In so limiting Overseas' defense, the arbitration court emphasized that Overseas had made no more than a perfunctory effort to secure special visas and that AID's notification that it was withdrawing financial backing did not justify Overseas' unilateral decision to abandon the project.[3] After further hearings in 1972, the tribunal made its final award in March, 1973: Overseas was held liable to RAKTA for $312,507.45 in damages for breach of contract and $30,000 for RAKTA's costs; additionally, the arbitrators' compensation was set at $49,000, with Overseas responsible for three-fourths of the sum.
 
 
 5
 Subsequent to the final award, Overseas in the action here under review sought a declaratory judgment to prevent RAKTA from collecting the award out of a letter of credit issued in RAKTA's favor by Bank of America at Overseas' request. The letter was drawn to satisfy any 'penalties' which an arbitral tribunal might assess against Overseas in the future for breach of contract. RAKTA contended that the arbitral award for damages met the letter's requirement of 'penalties' and counter-claimed to confirm and enter judgment upon the foreign arbitral award. Overseas' defenses to this counterclaim, all rejected by the district court, form the principal issues for review on this appeal. Four of these defenses are derived from the express language of the applicable United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Convention), 330 U.N.Treaty Ser. 38, and a fifth is arguably implicit in the Convention. These include: enforcement of the award would violate the public policy of the United States, the award represents an arbitration of matters not appropriately decided by arbitration; the tribunal denied Overseas an adequate opportunity to present its case; the award is predicated upon a resolution of issues outside the scope of contractual agreement to submit to arbitration; and the award is in manifest disregard of law. In addition to disputing the district court's rejection of its position on the letter of credit, RAKTA seeks on appeal modification of the court's order to correct for an arithmetical error in sum entered for judgment, as well as an assessment of damages and double costs against Overseas for pursuing a frivolous appeal.
 
 I. OVERSEAS' DEFENSES AGAINST ENFORCEMENT
 
 6
 In 1958 the Convention was adopted by 26 of the 45 states participating in the United Nations Conference on Commercial Arbitration held in New York. For the signatory state, the New York Convention superseded the Geneva Convention of 1927, 92 League of Nations Treaty Ser. 302. The 1958 Convention's basic thrust was to liberalize procedures for enforcing foreign arbitral awards: While the Geneva Convention placed the burden of proof on the party seeking enforcement of a foreign arbitral award and did not circumscribe the range of available defenses to those enumerated in the convention, the 1958 Convention clearly shifted the burden of proof to the party defending against enforcement and limited his defenses to seven set forth in Article V. See Contini, International Commercial Arbitration, 8 Am.J.Comp.L. 283, 299 (1959). Not a signatory to any prior multilateral agreement on enforcement of arbitral awards, the United States declined to sign the 1958 Convention at the outset. The United States ultimately acceded to the Convention, however, in 1970, (1970) 3 U.S.T. 2517, T.I.A.S. No. 6997, and implemented its accession with 9 U.S.C. 201-208. Under 9 U.S.C. 208, the existing Federal Arbitration Act, 9 U.S.C. 1-14, applies to the enforcement of foreign awards except to the extent to which the latter may conflict with the Convention. See generally, Comment, International Commercial Arbitration under the United Nations Convention and the Amended Federal Arbitration Statute, 47 Wash.L.Rev. 441 (1972).
 
 A. Public Policy
 
 7
 Article V(2)(b) of the Convention allows the court in which enforcement of a foreign arbitral award is sought to refuse enforcement, on the defendant's motion or sua sponte, if 'enforcement of the award would be contrary to the public policy of (the forum) country.' The legislative history of the provision offers no certain guidelines to its construction. Its precursors in the Geneva Convention and the 1958 Convention's ad hoc committee draft extended the public policy exception to, respectively, awards contrary to 'principles of the law' and awards violative of 'fundamental principles of the law.' In one commentator's view, the Convention's failure to include similar language signifies a narrowing of the defense. Contini, supra, 8 Am.J.Comp.L. 283 at 304. On the other hand, another noted authority in the field has seized upon this omission as indicative of an intention to broaden the defense. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1070-71 (1961).
 
 
 8
 Perhaps more probative, however, are the inferences to be drawn from the history of the Convention as a whole. The general pro-enforcement bias informing the Convention and explaining its supersession of the Geneva Convention points toward a narrow reading of the public policy defense. An expansive construction of this defense would vitiate the Convention's basic effort to remove preexisting obstacles to enforcement. See Straus, Arbitration of Disputes between Multinational Corporations, in New Strategies for Peaceful Resolution of International Business Disputes 114-15 (1971); Digest of Proceedings of International Business Disputes Conference, April 14, 1971, in id. at 191 (remarks of Professor W. Reese). Additionally, considerations of reciprocity-- considerations given express recognition in the Convention itself[4] -- counsel courts to invoke the public policy defense with caution lest foreign courts frequently accept it as a defense to enforcement of arbitral awards rendered in the United States.
 
 
 9
 We conclude, therefore, that the Convention's public policy defense should be construed narrowly. Enforcement of foreign arbitral awards may be denied on this basis only where enforcement would violate the forum state's most basic notions of morality and justice. Cf. 1 Restatement Second of the Conflict of Laws 117, comment c, at 340 (1971); Loucks v. Standard Oil Co.,224 N.Y. 99, 111, 120 N.E. 198 (1918).
 
 
 10
 Under this view of the public policy provision in the Convention, Overseas' public policy defense may easily be dismissed. Overseas argues that various actions by United States officials subsequent to the severance of American-Egyptian relations-- most particularly, AID's withdrawal of financial support for the Overseas-RAKTA contract-- required Overseas, as a loyal American citizen, to abandon the project. Enforcement of an award predicated on the feasibility of Overseas' returning to work in defiance of these expressions of national policy would therefore allegedly contravene United States public policy. In equating 'national' policy with United States 'public' policy, the appellant quite plainly misses the mark. To read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility. This provision was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.' Rather, a circumscribed public policy doctrine was contemplated by the Convention's framers and every indication is that the United States, in acceding to the Convention, meant to subscribe to this supranational emphasis. Cf. Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).[5]
 
 
 11
 To deny enforcement of this award largely because of the United States' falling out with Egypt in recent years would mean converting a defense intended to be of narrow scope into a major loophole in the Convention's mechanism for enforcement. We have little hesitation, therefore, in disallowing Overseas' proposed public policy defense.
 
 B. Non-Arbitrability
 
 12
 Article V(2)(a) authorizes a court to deny enforcement, on a defendant's or its own motion, of a foreign arbitral award when 'the subject matter of the difference is not capable of settlement by arbitration under the law of that (the forum) country.' Under this provision, a court sitting in the United States might, for example, be expected to decline enforcement of an award involving arbitration of an antitrust claim in view of domestic arbitration cases which have held that antitrust matters are entrusted to the exclusive competence of the judiciary. See, e.g., American Safety Equipment Corp. v. J.P.Maguire & Co., 391 F.2d 821 (2d Cir. 1968). On the other hand, it may well be that the special considerations and policies underlying a 'truly international agreement,' Scherk v. Alberto-Culver Co., supra, 417 U.S. 506 at 515, 94 S.Ct. 2449, call for a narrower view of non-arbitrability in the international than the domestic context. Compare id. with Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (enforcement of international but not domestic, agreement to arbitrate claim based on alleged Securities Act violations.)
 
 
 13
 Resolution of Overseas' non-arbitrability argument, however, does not require us to reach such difficult distinctions between domestic and foreign awards. For Overseas' argument, that 'United States foreign policy issues can hardly be placed at the mercy of foreign arbitrators 'who are charged with the execution of no public trust' and whose loyalties are to foreign interests,' Brief for Appellant at 23, plainly fails to raise so substantial an issue of arbitrability. The mere fact that an issue of national interest may incidentally figure into the resolution of a breach of contract claim does not make the dispute not arbitrable. Rather, certain categories of claims may be non-arbitrable because of the special national interest vested in their resolution. Cf. American Safety Equipment Corp., supra, 391 F.2d 821 at 826-827. Furthermore, even were the test for non-arbitrability of an ad hoc nature, Overseas' situation would almost certainly not meet the standard, for Overseas grossly exaggerates the magnitude of the national interest involved in the resolution of its particular claim. Simply because acts of the United States are somehow implicated in a case one cannot conclude that the United States is vitally interested in its outcome. Finally, the Supreme Court's decision in favor of arbitrability in a case far more prominently displaying public features than the instant one, Scherk v. Alberto-Culver Co., supra, compels by analogy the conclusion that the foreign award against Overseas dealt with a subject arbitrable under United States law.
 
 
 14
 The court below was correct in denying relief to Overseas under the Convention's non-arbitrability defense to enforcement of foreign arbitral awards. There is no special national interest in judicial, rather than arbitral, resolution of the breach of contract claim underlying the award in this case.
 
 
 15
 C. Inadequate Opportunity to Present Defense
 
 
 16
 Under Article V(1)(b) of the Convention, enforcement of a foreign arbitral award may be denied if the defendant can prove that he was 'not given proper notice . . . or was otherwise unable to present his case.' This provision essentially sanctions the application of the forum state's standards of due process. See Quigley, supra, 70 Yale L.J. 1049 at 1067 n. 81; Quigley, Convention on Foreign Arbitral Awards, 58 A.B.A.J. 821, 825 (1972); Aksen, American Arbitration Accession Arrives in the Age of Aquarius, in New Strategies, supra, at 48.
 
 
 17
 Overseas seeks relief under this provision for the arbitration court's refusal to delay proceedings in order to accommodate the speaking schedule of one of Overseas' witnesses, David Nes, the United States Charge d'Affairs in Egypt at the time of the Six Day War. This attempt to state a due process claim fails for several reasons. First, inability to produce one's witnesses before an arbitral tribunal is a risk inherent in an agreement to submit to arbitration. By agreeing to submit disputes to arbitration, a party relinquishes his courtroom rights-- including that to subpoena witnesses-- in favor of arbitration 'with all of its well known advantages and drawbacks.' Washington-Baltimore Newspaper Guild, Local 35 v. The Washington Post Co.,143 U.S.App.D.C. 210, 442 F.2d 1234, 1238 (1971). Secondly, the logistical problems of scheduling hearing dates convenient to parties, counsel and arbitrators scattered about the globe argues against deviating from an initially mutually agreeable time plan unless a scheduling change is truly unavoidable. In this instance, Overseas' allegedly key witness was kept from attending the hearing due to a prior commitment to lecture at an American university-- hardly the type of obstacle to his presence which would require the arbitral tribunal to postpone the hearing as a matter of fundamental fairness to Overseas.Finally, Overseas cannot complain that the tribunal decided the case without considering evidence critical to its defense and within only Mr. Nes' ability to produce. In fact, the tribunal did have before it an affidavit by Mr. Nes in which he furnished, by his own account, 'a good deal of the information to which I would have testified.' Appendix to Brief of Appellant at 184a. Moreover, had Mr. Nes wished to furnish all the information to which he would have testified, there is every reason to believe that the arbitration tribunal would have considered that as well.
 
 
 18
 The arbitration tribunal acted within its discretion in declining to reschedule a hearing for the convenience of an Overseas witness. Overseas' due process rights under American law, rights entitled to full force under the Convention as a defense to enforcement, were in no way infringed by the tribunal's decision.
 
 D. Arbitration in Excess of Jurisdiction
 
 19
 Under Article V(1)(c), one defending against enforcement of an arbitral award may prevail by proving that:
 
 
 20
 The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . ..
 
 
 21
 This provision tracks in more detailed form 10(d) of the Federal Arbitration Act, 9 U.S.C. 10(d), which authorizes vacating an award 'where the arbitrators exceeded their powers.' Both provisions basically allow a party to attack an award predicated upon arbitration of a subject matter not within the agreement to submit to arbitration. This defense to enforcement of a foreign award, like the others already discussed, should be construed narrowly. Once again a narrow construction would comport with the enforcement-facilitating thrust of the Convention. In addition, the case law under the similar provision of the Federal Arbitration Act strongly supports a strict reading. See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Coenen v. R. W. Pressprich & Co., 453 F.2d 1209 (2d Cir.), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972).
 
 
 22
 In making this defense as to three components of the award, Overseas must therefore overcome a powerful presumption that the arbitral body acted within its powers. Overseas principally directs its challenge at the $185,000 awarded for loss of production. Its jurisdictional claim focuses on the provision of the contract reciting that 'neither party shall have any liability for loss of production.' The tribunal cannot properly be charged, however, with simply ignoring this alleged limitation on the subject matter over which its decision-making powers extended. Rather, the arbitration court interpreted the provision not to preclude jurisdiction on this matter. As in United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, the court may be satisfied that the arbitrator premised the award on a construction of the contract and that it is 'not apparent,' 363 U.S. 593 at 598, 80 S.Ct. 1358, that the scope of the submission to arbitration has been exceeded.
 
 
 23
 The appellant's attack on the $60,000 awarded for start-up expenses and $30,000 in costs cannot withstand the most cursory scrutiny. In characterizing the $60,000 as 'consequential damages' (and thus proscribed by the arbitration agreement), Overseas is again attempting to secure a reconstruction in this court of the contract-- an activity wholly inconsistent with the deference due arbitral decisions on law and fact. See generally, Bernhardt v. Polygraphic Company of America, Inc., 350 U.S. 198, 203 & n. 4, 76 S.Ct. 273, 100 L.Ed. 199 (1956). The $30,000 in costs is equally unassailable, for the appellant's contention that this portion of the award is inconsistent with guidelines set by the International Chamber of Commerce is twice removed from reality. First of all, contrary to Overseas' representations, these guidelines (contained in the Guide to ICC Arbitration and reproduced in relevant part in Appendix to Brief of Appellant at 408a) do not require, as a pre-condition to an award of expenses, express authority for such an award in the arbitration clause. The arbitration agreement's silence on this matter, therefore, is not determinative in the case under review. Secondly, since the parties in fact complied with the Guide's advice to reach agreement on this matter prior to arbitration-- i.e., the request by each for such an award for expenses amounts to tacit agreement on this point-- any claim of fatal deviation from the Guide is disingenuous to say the least.
 
 
 24
 Although the Convention recognizes that an award may not be enforced where predicated on a subject matter outside the arbitrator's jurisdiction, it does not sanction second-guessing the arbitrator's construction of the parties' agreement. The appellant's attempt to invoke this defense, however, calls upon the court to ignore this limitation on its decision-making powers and usurp the arbitrator's role. The district court took a proper view of its own jurisdiction in refusing to grant relief on this ground.
 
 E. Award in 'Manifest Disregard' of Law
 
 25
 Both the legislative history of Article V, see supra, and the statute enacted to implement the United States' accession to the Convention[6] are strong authority for treating as exclusive the bases set forth in the Convention for vacating an award. On the other hand, the Federal Arbitration Act, specifically 9 U.S.C. 10, has been read to include an implied defense to enforcement where the award is in 'manifest disregard' of the law. Wilko v. Swan, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953); Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577, 582 (2d Cir. 1967); Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir. 1960).
 
 
 26
 This case does not require us to decide, however, whether this defense stemming from dictum in Wilko, supra, obtains in the international arbitration context. For even assuming that the 'manifest disregard' defense applies under the Convention, we would have no difficulty rejecting the appellant's contention that such 'manifest disregard' is in evidence here. Overseas in effect asks this court to read this defense as a license to review the record of arbitral proceedings for errors of fact or law-- a role which we have emphatically declined to assume in the past and reject once again. 'Extensive judicial review frustrates the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings.' Saxis Steamship Co., supra, 375 F.2d 577 at 582. See also, Amicizia Societa Navegazione, supra, 274 F.2d 805 at 808.
 
 
 27
 Insofar as this defense to enforcement of awards in 'manifest disregard' of law may be cognizable under the Convention, it, like the other defenses raised by the appellant, fails to provide a sound basis for vacating the foreign arbitral award. We therefore affirm the district court's confirmation of award.
 
 
 28
 RAKTA does not frame its appeal from the district court's decision disallowing collection on the letter of the district court's confirmation of the the district court's confirmation of the award. Nevertheless, since RAKTA can fully satisfy the award out of a supersedeas bond posted by the appellant, we consider RAKTA's appeal no longer to require resolution and therefore decline to rule on it.[7]
 
 
 29
 II. TECHNICAL CORRECTION OF THE JUDGMENT, AND SUPPLEMENTARY AWARD TO RENALIZE PURSUIT OF FRIVOLOUS APPEAL
 
 
 30
 The district court entered judgment on the arbitral award for $342,507.45. RAKTA contends that the court erred in its arithmetic, the correct sum being $4,750 higher. And, indeed, RAKTA demonstrates with ease that Overseas' indebtedness includes the difference between $36,750, the extent of its liability for the arbitrators' compensation, and $32,000, the amount already paid by Overseas for these costs. This does not end the inquiry, however, for RAKTA has only established that Overseas owes $4,750 for arbitration costs, not that it owes this sum to RAKTA.
 
 
 31
 Overseas does not dispute, then, this $4,750 indebtedness on its part but instead argues that the amount is payable to the I.C.C. and not to RAKTA. Since the $32,000 paid at the outset of arbitration by Overseas (as well as by RAKTA, which is entitled to a partial refund) was paid to the I.C.C. and the $4,750 outstanding will go to compensate a tribunal operating under the auspices of the I.C.C., it would appear that this sum is due the I.C.C. rather than RAKTA. The district court did not discuss its reasons for excluding this $4,750 from the judgment. The court did have before it, however, an affidavit by counsel for RAKTA making the essentially identical argument as made on appeal for inclusion of the $4,750. We discount, then, the possibility of mere oversight on the district court's part in excluding this sum from the judgment. Rather, we find that this exclusion reflects the most plausible interpretation of Overseas' liability to RAKTA and therefore decline to amend the judgment upward by $4,750.
 
 
 32
 RAKTA also requests that this court award it damages and double costs as a penalty against Overseas for pursuing an allegedly frivolous appeal for purposes of delay. It is true that such an award has been made where an appellant presses a case of unquestionable frivolity, particularly where 'the inference of an intent to delay is plausible.' South East Atlantic Shipping Ltd. v. Garnac Grain Co., 356 F.2d 189, 192-193 (2d Cir. 1966). See also, Oscar Gruss & Son v. Lumbermen's Mutual Casualty Co., 422 F.2d 1278, 1284 (2d Cir. 1970). But although we are not persuaded by any of the appellant's numerous defenses to enforcement of the arbitral award, we would consider it harsh indeed to penalize by damages and double costs an effort of apparent honesty to explore the defense possibilities presented by a new and largely untested statute. We therefore reject RAKTA's invitation to supplement its judgment with the type of award reserved for fundamentally insincere appeals.
 
 
 33
 We affirm the district court's confirmation of the foreign arbitral award. Since the latter affirmance renders academic the validity of the court's disposition of RAKTA's letter of credit claim, we do not rule on RAKTA's appeal from that part of the order below. Additionally, we find no error in the court's computation of Overseas' liability to RAKTA and deny RAKTA's request to assess damages and double costs against Overseas for bringing an allegedly frivolous appeal.
 
 
 34
 Affirmed.
 
 
 
 [1]
 Bank of America assumes the position of an innocent stakeholder and awaits this court's direction on the letter of credit claim
 
 
 [2]
 Overseas initiated suit in New York Supreme Court and the case was removed to federal court on RAKTA's petition
 
 
 [3]
 RAKTA represented to the tribunal that it was prepared to finance the project without AID's assistance
 
 
 [4]
 A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention
 Article XIV. Cf. Comment, supra, 47 Wash.L.Rev. 441 at 486-87:
 In a system based upon reciprocity any tendency to take an overly narrow view of foreign arbitral awards will be balanced by a desire to obtain the widest acceptance of America's awards among the courts of other signatory states, which also have the public policy loophole available to them.
 
 
 [5]
 Moreover, the facts here fail to demonstrate that considered government policy forbids completion of the contract itself by a private party
 
 
 [6]
 The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement specified in the said Convention
 9 U.S.C. 207.
 
 
 [7]
 In view of the general rule requiring strict conformity with the terms of a letter of credit, however, Venizelos, S.A. v. Chase Manhattan Bank, 425 F.2d 461, 464-465 (2d Cir. 1970); Banco Espanol de Credito v. State Street Bank & Trust Co., 385 F.2d 230, 234 (1st Cir. 1967), cert. denied, 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968); Marine Midland Grace Trust Company of New York v. Banco del Pais, S.A., 261 F.Supp. 884, 889 (S.D.N.Y.1966), we do register doubts about the force of RAKTA's claim. For while the letter provides, in relevant part, that payment to RAKTA awaits presentation of 'an award issued by arbitrators . . . indicating the amount of the penalty due,' the award itself was written in terms of 'damages' rather than 'penalties.' But we refrain from passing on this admittedly complex issue and limit our affirmance to the district court's confirmation of the foreign award