**FERTILIZER CORPORATION OF INDIA, et al., Petitioners,**

v.

**IDI MANAGEMENT, INC., Respondent.**

**No. C–1–79–570.**

United States District Court, S. D. Ohio, W. D.

June 9, 1981.

---

Gerald L. Draper, Columbus, Ohio, for petitioners.

James R. Bridgeland, Jr., Cincinnati, Ohio, for respondent.

## MEMORANDUM OPINION AND DECISION

SPIEGEL, District Judge.

Fertilizer Corporation of India (FCI) brings this petition for enforcement, under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention), 9 U.S.C. §§ 201 *et seq.*, of an arbitral award rendered in India in FCI's favor against respondent IDI Management, Inc. (IDI). FCI asks that judgment be entered in its favor for 9,679,000 rupees ($1.3 million) with interest at the rate of 6% from November 29, 1968 until November 1, 1976 and at the rate prescribed by law thereafter; for $10,118.31 with interest at 6% from December 31, 1967 to November 1, 1976 and at the rate prescribed by law thereafter; and for $46,765 plus interest at the rate prescribed by law from February 20, 1979 (doc. 10). IDI has interposed a number of affirmative defenses to enforcement of the award, and has also counterclaimed (doc. 7) for enforcement of a prior arbitration award and for judgment for $302,600.50 with interest at 6% from July 8, 1967 to the date of the award, and for $28,000 in accord with the prior award.

The matter is before the Court on FCI's motion for confirmation of arbitral award and entry of judgment (doc. 10) and on the briefs, memoranda and exhibits of the par-

ties. Oral arguments were held on April 7 and 8, 1981.

FACTUAL SUMMARY

Petitioner FCI, a wholly-owned entity of the Government of India, is engaged in the manufacture, marketing and sale of fertilizers. Rashtriya Chemicals & Fertilizers is FCI's legal successor in interest with respect to the manufacturing facility located at Trombay, Bombay, India. IDI, the successor in interest to Chemical & Industrial Corp. (C & I) is an Ohio corporation whose business includes the design, engineering and construction of complex fertilizer plants.

In 1962 FCI and IDI's predecessors in interest entered into a contract (Ex. A to petition) for construction of a nitrophosphate plant near Bombay, India. The contract provided that all disputes between the parties "shall be finally settled by arbitration in conformity with the rules of conciliation and arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the rules." After the facility was built, a dispute arose concerning the quantity of daily production from the plant. FCI requested arbitration through the International Chamber of Commerce (ICC) in 1968.

Pursuant to the rules of the ICC, each party designated an arbitrator, Mr. Sen by FCI and Mr. Wilson by IDI. Lord Devlin was appointed as the third member and chairman. The arbitrators met on numerous occasions between 1971 and 1976, including twenty-five evidentiary sessions in 1974 and 1975. On November 1, 1976, the arbitrators unanimously awarded to FCI 9,679,000 rupees plus $10,118.31. IDI failed to pay to the ICC its share of the arbitration's costs and expenses; therefore, the award was not released to the parties until FCI deposited the full amount of those fees in 1979. This award, known as the "Nitrophosphate Award," is a so-called "speaking award" in which the panel, in a lengthy document, gave reasons for its findings (Ex. C to petition).

Prior to 1968, the same arbitrators were appointed to resolve a dispute between the same parties over the construction of a methanol plant, also near Bombay, India. A contract for that project had been entered into in 1964. This contract also contained an arbitration clause; it provided for arbitration under the provisions of the Indian Arbitration Act, rather than under the rules of the ICC. In 1974, an award of more than $300,000 was issued in favor of IDI (Ex. 1 to counterclaim). This Methanol Award, the subject of the counterclaim in this case, was a so-called "non-speaking" award in which no reasons for the findings were given. Mr. Sen did not concur; he wrote a dissent after the majority published its award. FCI appealed this award to an Indian court which, however, found for IDI and entered judgment on the award. FCI appealed, and that appeal is pending. FCI has deposited a portion of the judgment; IDI has furnished guarantees required by the Indian court before withdrawing the deposit. Because of foreign exchange regulations, the Government of India has not allowed withdrawal up to this time.

With respect to the Nitrophosphate Award, the subject of the petition and motion in this case, IDI has filed in an Indian court to set aside the award, and FCI has petitioned another Indian court for confirmation of the award. Both actions are pending. FCI then petitioned this Court for enforcement of the Nitrophosphate Award under the Convention.

CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

The Convention is a United Nations treaty to which the United States became a party in December 1970. India ratified the treaty in 1961. Legislation implementing the Convention is codified in Chapter 2 of Title 9 of the United States Code. Under 9 U.S.C. § 203 the district courts of the United States are given original jurisdiction over actions or proceedings falling under the Convention. Any party to such a proceeding may, within three years after an arbitral award is made, apply to a district court for an order confirming the award. "The court shall confirm the award unless it

finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

A party seeking recognition and enforcement of an award must supply with its application the original award and the original agreement between the parties, or certified copies of those documents. Convention, Art. IV. FCI has submitted both required documents to this Court. The Convention provides in Article V that recognition and enforcement may be refused if the party against whom the Convention is invoked proves one or more of seven basic defenses. IDI has claimed several of these defenses. The Convention's Article VI gives this Court discretion to adjourn the decision on enforcement of the award where an application for the setting aside or suspension of that award has been made to a competent authority of the country in which or under whose law the award was made. Such an application, as described earlier, has been made.

THE DEFENSES

IDI asserts five basic defenses to enforcement of the Nitrophosphate Award:

1) Application of the Convention in this case would be retroactive and therefore improper;

2) The reciprocity required under the Convention is absent;

3) Enforcement of the award would violate the public policy of the United States because of an undisclosed relationship between FCI and Arbitrator Sen;

4) The award is not binding within the meaning of the Convention and is therefore unenforceable at this time;

5) The arbitrators exceeded their jurisdiction in awarding consequential damages in contravention of an express clause in the contract between the parties.

Since FCI has submitted to the Court the documents required by the Convention, we must confirm the award unless we find in favor of IDI on one of its asserted defenses or choose to adjourn our decision under Article VI. We will analyze each defense in turn before reaching a decision.

I. FIRST AFFIRMATIVE DEFENSE, RETROACTIVITY

FCI and IDI entered into the nitrophosphate contract on May 8, 1962. The United States did not accede to the Convention until 1970. IDI contends that the Convention may not be applied to an arbitration under a contract which predates the Convention's adoption by the United States and that, consequently, FCI has not properly invoked the jurisdiction of this Court. IDI cites as elementary a principle of statutory construction holding enactments solely prospective absent express and constitutionally permissible language to the contrary. Although there is an exception to this general rule for purely procedural statutes, IDI submits that arbitration statutes involve the parties' substantive rights by fundamentally altering their contractual relationships.

FCI counters by asserting that application of the Convention to this award is not retroactive because the award sought to be enforced was not rendered until 1976, years after the United States acceded to the Convention. Alternatively, FCI argues that, even if the Convention's application here were to be considered retroactive, the Convention is remedial in nature and may properly be given retroactive effect. No substantive rights are affected, they contend; rather, the treaty simply provides the parties with an additional forum in which to seek enforcement of the award.

The Court agrees with FCI on this issue. We find that the Convention does not affect the parties' substantive rights; those rights were effectively determined by their contract, which provided for final arbitration under the rules of the ICC. *See McGee v. International Life Insurance Co.*, 355 U.S. 220, 224, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). Arbitration was carried out under those rules, just as it would have been had the United States never adopted the Convention.

In the same situation, where a contract was executed before the Convention's adoption but the award was rendered after the adoption date, other courts have applied the Convention in actions for enforcement, including an action affirmed by the Court of Appeals for the Sixth Circuit. *In the Matter of the Arbitration Between Audi NSO Auto Union Aktiengesellschaft v. Overseas Motors, Inc.*, No. 6–71054 (E.D. Mich., March 15, 1977), *aff'd*, 595 F.2d 1222 (6th Cir. 1979) (contract entered into in 1968; award handed down in 1973). *See also Imperial Ethiopian Govt. v. Baruch-Foster Corp.*, 535 F.2d 334 (5th Cir. 1976); *Fotochrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512 (2d Cir. 1975).

■ We hold, therefore, that the jurisdiction of this Court under the Convention has been properly invoked and that the Convention should be applied, even though the parties contracted before the United States adopted the Convention.

## II. SECOND AFFIRMATIVE DEFENSE, RECIPROCITY

IDI argues that India would not enforce the Nitrophosphate Award had it been rendered in the United States in IDI's favor and that therefore the reciprocity between India and the United States required by the Convention is absent. India has adopted various evasive devices, IDI submits, to avoid enforcement of awards adverse to Indian parties. Moreover, Article I, paragraph 3 of the Convention [1] states that contracting states may choose to apply the Convention only to legal relationships considered "commercial" under the law of the acceding state, and may also choose to apply the Convention only to awards made in another contracting state's territory. Both India and the United States chose to adopt these restrictions. Citing *Indian Organic Chemicals, Ltd. v. Chemtex Fibers, Inc.*, A.I.R. 1978 Bombay 106, IDI alleges that India has narrowly defined the term "commercial" so as to exclude many or most legal relationships which would be considered "commercial" in the normal sense of the word. IDI argues further that Article XIV of the Convention [2] sweeps broadly and, in effect, requires this Court to determine the extent to which India is applying the Convention and to react in like manner.

FCI contends that the concept of reciprocity does not apply to the commercial reservation, citing the fact that the phrase "on the basis of reciprocity" appears in the first sentence of Art. I, paragraph 3, *supra*, but does not appear in the second sentence, the "commercial" reservation. Furthermore, it cites legislative history for the proposition that Article XIV does not apply at all to Article I, which has its own reciprocity clause. In the alternative, if Article XIV does apply to the entire Convention, it must be read literally. Article XIV says that a contracting state may avail itself of the Convention only "to the extent that it is itself *bound to apply* the Convention" (emphasis added). Whereas IDI reads "bound to apply" as "applies," FCI urges a reading which would allow a contracting state which had not, for example, adopted the "commercial" reservation to do so when faced with an award rendered in a country which had adopted that reservation. Under FCI's interpretation of reciprocity, all that is required, since the United States has adopted the first reservation of Article I, paragraph 3, *supra*, is to determine that India is a signatory to the Convention and, since the United States has adopted the second reservation, to determine that the

1. "When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration." Convention, Art. I, para. 3.

2. "A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention." Convention, Art. XIV.

contract in question is commercial under the laws of the *United States.* If more is required, FCI asserts that the contract would also be considered commercial by most courts in India and that *Chemtex* is an aberration.

 The Court is persuaded that the reciprocity required by the Convention is satisfied in this case. With regard to the wording of Article I, paragraph 3, it is an elementary rule of statutory construction that where express language is used in one part of a statute, its omission from another part is presumed to be deliberate. It is undisputed that India is a signatory to the Convention; therefore, the reciprocity of the first sentence in question is satisfied. It is equally undisputed that the contract between the parties is considered commercial under the laws of the United States; thus, the requirement of the second sentence is met.

As to Article XIV, Leonard Quigley has said, "The adoption of this Article [XIV] gives states a defensive right to take advantage of another state's reservations with regard to territorial, federal or other provisions." L. Quigley, "Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 70 Yale L.J. 1049, 1074 (1961). Quigley also mentions that this clause "presumably will also cover the case where the courts of a State have placed a restrictive interpretation upon its obligations under the Convention," *Id.,* but we do not find this comment determinative.

In any case, we are satisfied that the Indian courts are not engaged in a devious policy to subvert the Convention by denying non-Indians their just awards. The Methanol Award, which is in IDI's favor, helps persuade us that the Indian judiciary is functioning in a responsible manner. Moreover, FCI has cited other cases and arbitrations showing that Indian courts will enforce awards against Indian parties and

that Indian parties do arbitrate outside of India. As IDI itself has counseled, United States courts should "construe exceptions narrowly lest foreign courts use holdings against application of the Convention as a reason for refusing enforcement of awards made in the United States" (doc. 22, p. 11).

## III. THIRD AFFIRMATIVE DEFENSE, PUBLIC POLICY—ARBITRATOR SEN'S RELATIONSHIP WITH FCI

IDI asserts that enforcement of the Nitrophosphate Award would violate the public policy of the United States, in violation of Article V(2)(b) of the Convention.[3] They allege that Mr. B. Sen, the arbitrator nominated by FCI for the Nitrophosphate case (as well as for the Methanol case) had served as counsel for FCI in at least two other legal or arbitral proceedings and that these facts were not disclosed to IDI. Respondent cites *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 812 (1968), *reh. denied,* 393 U.S. 1112, 89 S.Ct. 848, 21 L.Ed.2d 812 (1969) to support the claim that American public policy demands that arbitrators be not only unbiased but free from even the appearance of bias. Further, they argue, since Mr. B. Sen was remunerated financially by FCI, the nondisclosure of the relationship is fatal to enforcement, despite the fact that the arbitration was unanimous and even though actual fraud or bias may be incapable of proof. IDI also claims that it had no constructive or other notice of Mr. Sen's relationship with FCI, although Indian counsel retained by IDI may have been aware of the arrangement. IDI has submitted affidavits of its responsible officers and past and present counsel (App. 2, Supp. App. C, D, E, F, G) to support this contention.

FCI responds that Mr. Sen was chosen properly under the ICC rules as well as under the Convention. Article V(1)(b) permits a refusal to enforce an award if the

---

**3.** "Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

\* \* \* \* \* \*

(b) The recognition or enforcement of the award would be contrary to the public policy of that country." Convention, Art. V, para. 2.

losing party was not given proper notice of the arbitrator's appointment or was otherwise unable to present his case; subsection (d) of this Article covers the case where the composition of the arbitral panel was not in accord with the parties' agreement.[4] IDI had proper notice and participated extensively in all sessions, presenting its case thoroughly. The contract between the parties calls for arbitration under the ICC rules by one or more arbitrators appointed in accordance with those rules (Ex. A to petition, ¶ 12.2). The ICC rules applicable at the time made no mention of neutrality, and not until the 1975 ICC rules became effective was an "independent" arbitrator required. FCI contends that even today it is not clear whether an "independent" arbitrator need be neutral. Moreover, they argue, Mr. Sen is a Senior Advocate and, as such, his relationship with FCI was not that of attorney and client. Rather, Senior Advocates in India are hired by the client's advocate (similar to the retention of a barrister by a solicitor under the British system), are paid by the advocate (who is normally reimbursed by the client), and the Senior Advocate is thus insulated from the client. He is an officer of the Court, like a British Queen's Counsel, and may argue for and against the same client at different times.

FCI answers further that, although not required by the ICC rules, a biographical data sheet on Mr. Sen was furnished to IDI; this indicated that he had a connection with the Indian Government, of which FCI is a wholly-owned entity.

FCI also claims that IDI had actual or constructive notice of Mr. Sen's relationship with FCI. They argue that IDI's Indian counsel, Mr. Pai, was well-acquainted with the facts and that his knowledge should be imputed to IDI. They also claim that an IDI vice-president was given a copy of another arbitration award which clearly revealed that Mr. Sen appeared on FCI's behalf. IDI vigorously denies any such knowledge on its part and strongly protests the propriety of imputing to IDI Mr. Pai's knowledge. IDI supports its denial with affidavits from Mr. Pai and other relevant personnel.

FCI has submitted the affidavit of Colin Ross-Munro, Q.C. (docs. 27–28) which states that there is no impropriety in an Indian Senior Advocate appearing in an arbitration on behalf of a party without disclosing that he had represented that party in another context. IDI has submitted the affidavit of George Mark Waller, Q.C. (doc. 32) which asserts exactly the opposite.

The Court does not take lightly IDI's charge. In view of the unanimity of the Nitrophosphate Award, there is nothing to suggest actual bias or prejudice on Mr. Sen's part, yet we strongly believe that full disclosure of any possible interest or bias is the better rule whenever one is in a position to determine the rights of others. However, we do not find that nondisclosure of Mr. Sen's relationship with FCI has so tainted the proceedings as to nullify the award.

FCI relies upon *Commonwealth Coatings, supra*, as the statement of American public policy with respect to neutrality of arbitrators. It is true that in this case a plurality of the Supreme Court found that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias," 393 U.S. at 150, 89 S.Ct. at 340, and stated that "we should, if anything, be even more scrupulous to safeguard the impartial-

---

**4.** "Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

\* \* \* \* \* \*

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitra-

tion proceedings or was otherwise unable to present his case; or

\* \* \* \* \* \*

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place..." Convention, Art. V, para. 1.

ity of arbitrators than judges," *Id.* at 149, 89 S.Ct. at 339. Two Justices concurred but emphasized that arbitrators are not to be held to the standards of Article III judges, or of any judges, 393 U.S. at 150, 89 S.Ct. at 340, White, J., concurring, and three Justices dissented, insisting that, in the absence of a showing of unfairness or partiality, there was no reason to set aside an award for failure to disclose a prior business relationship. 393 U.S. at 153, 89 S.Ct. at 341, Fortas, J., dissenting.

Moreover, *Commonwealth Coatings* is distinguishable on the facts. That case dealt with a so-called tri-partite arbitration where one party chose one arbitrator, the other party chose a second, and those two arbitrators selected the third. The controversy centered on the third arbitrator, "the supposedly neutral member of the panel." 393 U.S. at 146, 89 S.Ct. at 338. In the present case, we are dealing, not with the third member of the panel, but with the member appointed by the party, FCI, with whom the alleged undisclosed relationship existed. The third member of the panel was Lord Devlin. Although IDI claims that Lord Devlin was appointed at Mr. Sen's suggestion, while FCI claims that he was appointed at Mr. Rand's (IDI's former counsel's) suggestion, and each supplies a letter purporting to uphold its claim (IDI's Supp. App. H and FCI's App. I), there is nothing at all to suggest that Lord Devlin was other than totally impartial. In fact, it is undisputed that the identical panel of arbitrators found for IDI in the Methanol arbitration, with Mr. Sen dissenting, but with Lord Devlin and Mr. Wilson favoring IDI.

The Court of Appeals for the Second Circuit has concluded that the Convention's public policy defense should be narrowly construed. "Enforcement of foreign arbitral awards may be denied on this basis only where enforcement would violate the forum state's most basic notions of morality and justice." *Parsons and Whittemore Overseas Co., Inc. v. Societe Generale de l'Industrie du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974). Even in domestic arbitrations, that Court has "viewed the teachings of *Commonwealth Coatings* pragmatically, employing a case-by-case approach in preference to dogmatic rigidity." *Andros Compania Maritima v. Marc Rich & Co.*, 579 F.2d 691, 700 (2d Cir. 1978). And, in a very recent case, the Second Circuit decided specifically that awards should not be vacated because of an appearance of bias. *International Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548 (2d Cir. 1981). We believe, also, that the Court has given wise advice in counseling courts "to invoke the public policy defense with caution lest foreign courts frequently accept it as a defense to enforcement of arbitral awards rendered in the United States." *Parsons and Whittemore, supra,* 508 F.2d at 974.

We therefore find that recognition or enforcement of the Nitrophosphate Award would not be contrary to the public policy of the United States, and enforcement may not be denied on this basis. The stronger public policy, we believe, is that which favors arbitration, both international and domestic, as exemplified in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) and in the *Steelworkers Trilogy.*[5]

IV. FOURTH AFFIRMATIVE DEFENSE, BINDING EFFECT OF THE AWARD

IDI's fourth defense is that the Nitrophosphate Award is not enforceable because it is not binding within the Convention's meaning. The Convention covers this point in Article V, section (1)(e) which provides for a refusal to enforce if:

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

---

5. *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

IDI argues that the award is not binding until it has been reviewed by an Indian court for errors of law. The award is presently before the Indian courts for a ruling, among other things, on whether the arbitrators could award consequential damages despite an express contract clause to the contrary. While American courts, they contend, review arbitration awards only for errors which are totally irrational or in manifest disregard of the law, Indian courts review "speaking awards" for any error of law. IDI contends that this kind of review is one on the merits and that it prevents any meaningful binding effect or finality.

FCI counters that under Indian law, both statutory and decisional, as well as under the ICC Rules and under the parties' contract, an arbitral award is final and binding. They argue that merely because an award has been challenged in an Indian court, its binding effect is not destroyed, just as a district court decision is binding on the parties, even though it is appealable, and a judgment may be executed upon unless the loser posts an appeal or supersedeas bond. FCI maintains that the Convention itself distinguishes, in Article V and Article VI, between a successful challenge and one that is merely pending. In Article VI, the enforcing Court (this Court) is given discretion to adjourn its decision if an application for setting aside an award has been made in the country where the award was rendered. Article V, they contend, was meant to cover the situation where a challenge has succeeded and the award has been set aside or suspended before the enforcement action is brought.

The contract (Ex. A to petition) between the parties provides in ¶ 12.2:

> Except as otherwise provided, all disputes and differences between FCI and C & I shall be finally settled by arbitration in conformity with the rules of conciliation and arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the rules. The venue of all arbitrations shall be New Delhi in India.

Both the 1955 and 1975 Rules of Conciliation and Arbitration of the ICC (App. B and C) provide, "The arbitral award shall be final." 1955 Rules, Article 29; 1975 Rules, Article 24.

The Indian Arbitration Act (App. A) provides in part:

> 3. An arbitration agreement, unless a different intention is expressed therein, shall be deemed to include the provisions set out in the First Schedule in so far as they are applicable to the reference.

The First Schedule, "Implied Conditions of Arbitration Agreements," provides in part:

> 7. The award shall be final and binding on the parties and persons claiming under them respectively.

The Indian Arbitration Act has been held to apply to all arbitrations in India. *Compagnie de Saint Gobain v. Fertilizer Corp. of India*, I.L.R. (1970) II Delhi 927, 936. This, incidentally, is a case in which Mr. Pai, IDI's counsel in India, appeared for St. Gobain, and Mr. B. Sen, the arbitrator for FCI in the present case, appeared for FCI.

The law in India with respect to the binding effect of an arbitral award has been well-stated by the Indian Supreme Court in *Satish Kumar v. Surinder Kumar*, AIR 1970 Supreme Court 833, 836:

> The true legal position in regard to the effect of an award is not in dispute. It is well settled that as a general rule, all claims which are the subject matter of a reference to arbitration merge in the award which is pronounced in the proceedings before the arbitrator and that after an award has been pronounced, the rights and liabilities of the parties in respect of the said claims can be determined only on the basis of the said award. After an award is pronounced, no action can be started on the original claim which had been the subject matter of the reference. As has been observed by Mookerjee, J. in the case of *Bhajahari Saha Banikya v. Behary Lal Basak,* (1909) ILR 33 Cal. 881 at p. 898, 'the award is, in fact, a final adjudication of a Court of the parties' own choice, and until

impeached upon sufficient grounds in an appropriate proceeding, an award, which is on the face of it regular, is conclusive upon the merits of the controversy submitted, unless possibly the parties have intended that the award shall not be final and conclusive . . . in reality, an award possesses all the elements of vitality even though it has not been formally enforced and it may be relied upon in a litigation between the parties relating to the same subject-matter.' This conclusion, according to the learned Judge, is based upon the elementary principle that, as between the parties and their privies, an award is entitled to that respect which is due to judgment of a court of last resort.

This indicates not only that an award is binding on the parties when made but that it has a *res judicata* effect in that it may be relied upon in litigation of the same subject matter between the parties. We note that IDI, citing no authority, states that an award is not *res judicata* as to the matters decided (doc. 13, p. 38).

The *Satish Kumar* Court in a concurring opinion went on to discuss the difference between rights vested in an award and enforcement of those rights:

The learned Judges who decided those cases appear to have proceeded on the basis that an award which cannot be enforced is not a valid award and the same does not create any rights in the property which is the subject matter of the award. This in my opinion is not a correct approach. The award does create rights in that property but those rights cannot be enforced until the award is made a decree of the Court. It is one thing to say that a right is not created, it is an entirely different thing to say that the right created cannot be enforced without further steps.

*Id.* at 837.

IDI attempts to distinguish *Satish Kumar* by characterizing it as an opinion having to do only with Indian land title registration. However, the Court in *Compagnie de Saint Gobain, supra*, a case dealing with an arbitration between an Indian company and a French company, similar to the present

case, also determined that such an award is, if regular on its face, conclusive on the merits of the controversy:

This view was approved and affirmed by the Supreme Court in *Satish Kumar v. Surinder Kumar & others*, AIR 1970 SC 833. It was held that an award has some legal force and is not a mere waste paper. Further, if the award is final and binding on the parties, it can hardly be said that it is a waste paper, unless it is made a rule of the court. Mr. Justice Hegde, in a separate judgment, agreeing with the majority, observed that "the award does create rights in that property, but these rights cannot be enforced until the award is made a decree of the Court." The award under consideration, thus creates rights and is final and, therefore, binding; although in case it is sought to be enforced in India, some further steps may be required to be taken for that purpose. I.L.R. (1970) II Delhi at 947.

IDI asks that we rely on an earlier Indian Supreme Court case, *Badat and Co. v. East India Trading Co.*, A.I.R. 1964 Supreme Court 538, and find that an award is not binding until a judgment has been obtained. This case involved an award which was rendered in New York under a New York statute. The Indian Supreme Court interpreted New York law as rendering an award final only when a judgment had been obtained on that award. The Court then refused enforcement because all appeals from the judgment had not yet been taken.

We find that this case is inadequate authority on several grounds. First, it involved an interpretation of New York law on finality. Second, it was decided in 1964, before the United States acceded to the Convention. Third, insofar as it is inconsistent with *Satish Kumar*, it is superseded by the later case.

■ We find that the Nitrophosphate Award is final and binding, for purposes of the Convention. Therefore, Article V, paragraph (1)(e) does not apply to prevent enforcement. We note the comment of Professor Gerald Aksen, General Counsel of the American Arbitration Association:

The award will be considered "binding" for the purposes of the Convention if no further recourse may be had to another arbitral tribunal (that is, an appeals tribunal). The fact that recourse may be had to a court of law does not prevent the award from being "binding." This provision should make it more difficult for an obstructive loser to postpone or prevent enforcement by bringing, or threatening to bring, proceedings to have an award set aside or suspended.

G. Aksen, "American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 3 Sw.U.L.Rev. 1, 11 (1971).

## V. FIFTH AFFIRMATIVE DEFENSE, CONSEQUENTIAL DAMAGES

It is IDI's position that the arbitrators exceeded their authority in awarding consequential damages and that the award is therefore unenforceable under Article V, section 1(c) of the Convention.[6] This argument is based on the parties' contract which expressly excludes from damages any amount for lost profits (Contract, Ex. A to petition, ¶ 8.8(B)).

FCI contends that Article V(1)(c) of the Convention covers only the case where a particular issue was not *submitted* to the arbitrators. Here, the question of consequential damages was included in the terms of reference, signed by both parties, which constituted the framework of the arbitration. Therefore, they argue, IDI has no defense under the Convention based on the award of consequential damages.

IDI concedes that the terms of reference included the question of consequential damages, but they maintained at oral argument that at all times they protested vigorously against awarding any damages whatsoever on the basis of lost profits. FCI counters that even if this defense is available under the Convention, the defense must fail because the law does not permit this Court to substitute its judgment for that of the arbitrators.

It is beyond dispute that the contract between these parties clearly excluded consequential damages. It is also undisputed that the arbitrators rendered a large award, based almost exclusively on consequential damages, in FCI's favor. The award (Ex. C to petition) is a long one and, after reviewing it carefully, the Court finds it to be a thorough and scholarly opinion, written for a unanimous panel by Lord Devlin, a well-respected jurist and former Law Lord of the English House of Lords.

The dispute, according to Lord Devlin's opinion, centered around a contract clause which guaranteed that the plant would produce a certain number of tons per day of fertilizer. There is an exhaustive account of the design and construction of the plant, of the two basic processes which were to be used, and of the problems which were encountered in bringing production up to the guarantee. In fact, the guarantee was never met while IDI's predecessors controlled the plant. At oral argument, IDI claimed that FCI took judicial possession of the plant and ejected the respondent before changes could be made to achieve the guaranteed production. The arbitrators found, however, that respondent had spent more time than the longest reasonable time allowed under the contract as interpreted by the arbitrators, without achieving the guaranteed production level. At this point, FCI "rescinded" the contract, took over complete management of the plant, and, within nine months, by using a process different from the two designated in the contract, brought the plant to a profitable level of production.

6. "1. Recognition and enforcement of the award may be refused ... if

\* \* \* \* \* \*

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced." Convention, Art. V.

Based on these facts, the arbitrators found that, as of a certain date, IDI's predecessors "repudiated" the contract by failing to hold, within a reasonable time, tests which were to demonstrate that the plant could meet its guarantee, and that FCI "rescinded" the contract based on respondent's repudiation. Using the concept of "fundamental breach," the arbitrators found that, in such a situation, the limitation of damages clause no longer applied. They awarded to FCI damages based on profits lost between the date the contract was "repudiated" and the date when the plant became profitable. Otherwise, there would have been virtually nothing on which to base damages, even though the panel found that, as of the date representing the outside limit of reasonable time, the plant's production was significantly below that promised. The award was predicated on the theory that there must have been some *quid pro quo* for FCI's promise not to claim consequential damages to which they otherwise might have been entitled; that, presumably, was IDI's promise to build a plant which would produce a guaranteed quantity of fertilizer within a reasonable time. Crucial to the award was a finding by the arbitrators that the production failure was caused by a basic design flaw in the plant. The design flaw, they found, was demonstrated by the fact that the plant's "wet section" produced a material with a moisture content too high for the plant's "dry section" to deal with efficiently. Subsequently, by using a process other than the two processes recommended by IDI's predecessor and called for in the contract, FCI was able to produce a material of lower moisture content which the dry section could handle effectively.

At oral argument, IDI alleged that FCI, at a later time, duplicated exactly the plant which respondent had designed and built for them. IDI implied that this duplication proved that the original plant was properly designed. While this matter is outside the record before us, we note that, according to the arbitration award, FCI was able to make profitable use of the plant by employing a different production process than the

two designated in the contract by IDI's predecessors. If so, it would not be unreasonable for FCI to have duplicated the plant, planning to use the third production process.

At oral argument, IDI also claimed that the theory of "fundamental breach" was a pet theory of Lord Devlin's which was not accepted by anyone else. The Court has, however, reviewed a very complete and well-documented commentary on the concept of fundamental breach in F. Dawson, "Fundamental Breach of Contract," 91 L.Q. Rev. 380 (1975). The Nitrophosphate Award's analysis is consistent with the explanation of fundamental breach provided by Professor Dawson. We find, therefore, that this is a viable theory of law, at least in the English system.

Without engaging in an in-depth analysis of the law of contract in the United States, we cannot say with certainty whether a breach of contract found to be material or "fundamental" would abrogate an express clause limiting damages to those other than consequential. The answer, however, is irrelevant. The standard of review of an arbitration award by an American court is extremely narrow. *General Telephone Co. of Ohio v. Communications Workers of America*, 648 F.2d 452 at 456 (6th Cir., 1981). The Convention "does not sanction second-guessing the arbitrator's construction of the parties' agreement," nor would it be proper for this Court "to usurp the arbitrator's role." *Parsons & Whittemore, supra*, 508 F.2d at 977.

We find under the Convention that the arbitrators did not exceed their authority in granting consequential damages in the Nitrophosphate Award. As the Supreme Court said years ago:

Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and

fair hearing of the parties, a court of equity will not set it aside from error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation.

*Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349, 15 L.Ed. 96 (1854). In the present case the award is within the submission to the arbitrators, there were numerous hearings, and we are impressed with the thoroughness and scholarship of the arbitrators' decision.

The Court of Appeals for the Second Circuit has stated:

When arbitrators explain their conclusions ... in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.

*Andros Compania Maritima, supra*, 579 F.2d at 704. We find at least colorable justification for the result reached in the Nitrophosphate Award.

In a case very similar to the present one, the Second Circuit affirmed a foreign arbitral award which granted damages for loss of production, though the contract excluded such liability. The Court found that Article V(1)(c) of the Convention tracked § 10(d) of the Federal Arbitration Act, 9 U.S.C. § 10(d), and that both sections required a narrow reading. The Court explained:

Both provisions basically allow a party to attack an award predicated upon arbitration of a subject matter not within the agreement to submit to arbitration. This defense to enforcement of a foreign award, like the others already discussed, should be construed narrowly. Once again a narrow construction would comport with the enforcement-facilitating thrust of the Convention. In addition, the case law under the similar provision of the Federal Arbitration Act strongly supports a strict reading.

*Parsons & Whittemore Overseas Co., Inc., supra*, 508 F.2d at 976.

We note that the provisions of the Federal Arbitration Act are to apply to proceedings under the Convention to the extent that no conflict exists between the two statutes. 9 U.S.C. § 208.

We note further that IDI has asked us to rely on *Farkar Co. v. R. A. Hanson Disc, Ltd.*, 583 F.2d 68 (2d Cir. 1978) for the proposition that a limitation of liability clause precludes arbitrators from considering claims for consequential damages. We find that case distinguishable, as it was an action to compel arbitration, rather than an action for enforcement of an award rendered after arbitration. Furthermore, the Court modified *Farkar* on rehearing, finding that the question of consequential damages must be submitted to arbitration if it is at all colorable so that the arbitrators could at least determine whether the limitations clause was unconscionable. *Farkar Co. v. R. A. Hanson Disc, Ltd.*, 604 F.2d 1 (2d Cir. 1979).

▮ We therefore agree with FCI that this Court, acting under the narrow judicial review of arbitral awards granted to American courts, may not substitute its judgment for that of the arbitrators. However, this arbitration was held in India, and, while the contract does not state specifically whose law shall govern, no party has claimed that American law should control. Since the contract was executed and was to be performed in India, and the venue of arbitration was expressly stated to be New Delhi, India, the Court concludes that the law of India governs the contract rights of the parties.

Indian courts are given broader review of arbitral awards than are American courts, when reasons for the award are given by the arbitrators. When a proposition of law is stated in the award and forms a basis of the award, that award can be set aside or remitted on the ground of error of law apparent on the face of the record, if the stated proposition of law is found by a court to be erroneous. *Chellapan v. Kerala State Electricity Board*, A.I.R. 1975 Supreme

Court 230, 235 (dictum). We interpret this to mean that an Indian court could set aside the Nitrophophate Award if it were to find that the law of fundamental breach, upon which a substantial portion of the award is based, is erroneous under Indian law. Therefore, while we do not find under the Convention that the arbitrators exceeded their authority in awarding consequential damages, as the issue was properly submitted to them,[7] we believe that we must consider seriously IDI's contention that we should adjourn our decision, under Article VI, pending resolution of this issue by the Indian court.

## VI. ARTICLE VI OF THE CONVENTION

Article VI provides:

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

This appears to be an unfettered grant of discretion; the Court has been unable to discover any standard on which a decision to adjourn should be based, other than to ascertain that an application to set aside or suspend the award has been made. Here, it is undisputed that IDI has made such an application in India.

Professor Aksen has commented:

Under Article VI it is left to the court or other competent authority from which enforcement is sought to decide what to do if an application to set aside or suspend the award has been made to a court

or other competent authority in the country in which the award was made.

G. Aksen, *supra*, at 11.

We believe it is important in making this decision to consider the purpose of the Convention. The primary thrust of the Convention is to make enforcement of arbitral awards more simple by liberalizing enforcement procedures, limiting defenses, and placing the burden of proof on the party opposing enforcement. *Parsons & Whittemore, supra*, 508 F.2d at 973; L. Quigley, "Convention on Foreign Arbitral Awards," 58 A.B.A.J. 821, 824 (1972).

The Supreme Court discussed at some length the goal of the Convention in *Scherk v. Alberto-Culver, supra,* 417 U.S. at 520 n.15, 94 S.Ct. at 2457, n.15:

. The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to verify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.

The Court also observed:

A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages.

*Id.* at 516–17, 94 S.Ct. at 2455–2456. The same would be true of a parochial refusal to enforce an arbitral award under the Convention.

We are not unmindful of the fact that IDI has been unable to collect in India its judgment on the Methanol Award. However, to allow that fact to influence our decision on enforcement of the Nitrophosp-

---

**7.** App. H., Terms of Reference to the Arbitrators in the Nitrophosphate Arbitration:

"1. Were the defendants in breach of contract by failing to supply a plant of the nature contracted for?

\* \* \* \* \* \*

5. If the answer to Issue No. 1 is yes, are claimants barred by paragraph 12.1 of the Contract from claiming damages for (a) costs of alterations to the plant, and (b) loss of profits during the period January 1, 1967 to March 31, 1968?"

hate Award would be "parochial" indeed. It is clear, as even IDI has conceded, that the Indian courts have enforced the Methanol Award and have required FCI to post security, but, as FCI apparently concedes, the Indian Government has not so far allowed the funds to be removed from the country. Whatever this Court may think of the propriety of the refusal, it is simply not a matter over which we have any jurisdiction, nor are we sufficiently informed of all the circumstances to have formed an educated opinion.

■ Nevertheless, in order to avoid the possibility of an inconsistent result, this Court has determined to adjourn its decision on enforcement of the Nitrophosphate Award until the Indian courts decide with finality whether the award is correct under Indian law. FCI, of course, may apply to this Court for suitable security, as provided by Article VI.

When we are informed that the Indian courts have reviewed the Nitrophosphate Award and rendered a decision, we will proceed to either grant or deny enforcement, based on that decision.

## VII. INTEREST, FEES AND COUNTERCLAIM

Items remaining to be determined are whether FCI is entitled to interest on the Nitrophosphate Award, whether FCI should be reimbursed for IDI's share of the arbitration fees which were paid in full by FCI, and whether the Methanol Award may be enforced in this Court, as requested in IDI's counterclaim.

FCI argues that it is entitled to 6% interest from the date of the award, under Ohio Rev.Code § 1343.03. They contend further that they paid the costs of arbitration in order to be able to bring this enforcement action within three years of the date the award was signed; they feared that IDI could claim a statute of limitations defense otherwise. FCI therefore claims that they

are entitled to be reimbursed for IDI's share of the arbitration costs, $46,765, plus interest at 6% from February 20, 1979, the date of the payment. They maintain that the costs were part of the arbitration award, that IDI simply refused to pay its share and that the ICC refused to release the award until all the costs were paid.

IDI contends that Indian law does not allow prejudgment interest on arbitral awards, that IDI was therefore not allowed prejudgment interest on the Methanol Award and that the same law should apply to the Nitrophosphate Award. They also argue that they had a legitimate dispute with the ICC over the costs of the arbitration and that FCI, by voluntarily paying IDI's share, rendered moot IDI's dispute. A volunteer is not entitled to reimbursement, they insist.

■ The Indian Arbitration Act in Article 29 provides for interest on an award only from the date of a court decree confirming the award.[8] IDI contends, and FCI does not dispute, that no prejudgment interest was allowed on the Methanol Award. Since we have determined that the substantive law of India governs this award, we find that Indian law relating to interest must also govern. Therefore, this Court will not order prejudgment interest. However, if the Indian courts review favorably the Nitrophosphate Award and render a decision confirming the award under Indian law, this Court will enforce the award under the Convention and will order interest as of the date this Opinion is entered.

With respect to the costs of arbitration, we can find little if any excuse for IDI's refusal to pay the costs assessed by the ICC. If we were to adopt IDI's reasoning, it would mean that the loser of an arbitration could delay forever the release of an award simply by refusing to pay the costs. We find that justice requires that FCI be reimbursed in the amount of $46,765. However,

8. "Where and in so far as an award is for the payment of money the Court may in the decree order interest, from the date of the decree at such rate as the court deems reasonable, to be paid on the principal sum as adjudged by the award and confirmed by the decree."
Art. 29, Arbitration Act, 1940, of India.

to be consistent, we will disallow prejudgment interest on this amount, as well.

IDI's counterclaim (doc. 7, ¶ 53) states: If this Court finds that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards applies, respondent IDI requests that this Court, pursuant to the Convention, enter an order and judgment recognizing and enforcing the arbitration award in the Methanol arbitration and the judgment and decree entered in accordance with the terms of that award by the High Court of Delhi at New Delhi, India.

 We find that IDI's counterclaim must be dismissed for two reasons. First, under 9 U.S.C. § 207, a party must apply to this Court for enforcement within three years after an award is made. The Methanol Award was made in 1974, while IDI's counterclaim seeking enforcement was filed in this Court on January 2, 1980. Thus, the counterclaim is time-barred since this Court finds that the Convention does apply to this case.

Second, we find that a counterclaim is inappropriate in a confirmation proceeding. In Chapter One of the Arbitration Act, 9 U.S.C. § 6, it is provided that a confirmation proceeding is to follow the rules for motion practice. Chapter One applies to proceedings brought under the Convention, which is codified as Chapter Two, insofar as no conflicts exist between the two. We find no conflict here. This matter is in fact before us on FCI's motion for confirmation (doc. 10), and a counterclaim may not be interposed in response to a motion. Furthermore, a confirmation proceeding is not an original action; it is, rather, in the nature of a post-judgment enforcement proceeding. In such a proceeding a counterclaim is clearly inappropriate. *In the Matter of the Arbitration Between Audi NSO Auto Union Aktiengesellschaft v. Overseas Motors, Inc.*, No. 6–71054 (E.D.Mich., March 15, 1977), *aff'd*, 595 F.2d 1222 (6th Cir. 1979).

Accordingly, IDI's counterclaim is dismissed.

SUMMARY

Having determined that IDI's defenses to enforcement of the Nitrophosphate Award fail, we adjourn our final decision on enforcement, pursuant to Article VI of the Convention, until the Indian courts resolve with finality pending actions relating to this award. If it is determined in India that the award is in accord with Indian law, we will enter judgment for FCI for 9,679,-000 Indian rupees plus $10,118.31 plus $46,-765, all with interest at 6% from the date of filing of this Opinion.

SO ORDERED.